Filed 10/28/22  The L.A. Wholesale Produce Market v. Atlas Capital Group CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE LOS ANGELES WHOLESALE PRODUCE MARKET, LLC, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ATLAS CAPITAL GROUP, LLC, et al., <br><br> Defendants and Appellants. | B299991 <br><br> (Los Angeles County Super. Ct. No. BC628018) |

APPEALS from a judgment and postjudgment order of the Superior Court of Los Angeles County, Robert S. Draper and Gail Feuer, Judges.  Affirmed as modified.

Boren, Osher & Luftman, Stephen Z. Boren and Steven F. Kuehl for Plaintiff and Appellant The Los Angeles Wholesale Produce Market, LLC.

Carlton Fields, Ellyn S. Garofalo, Amir Kaltgrad; DLA Piper and Karen Hallock for Defendants and Appellants Atlas Capital Group, LLC and Alameda Square Owner LLC.

_____

This action concerns a dispute over access rights on adjacent parcels of property in downtown Los Angeles. Plaintiff The Los Angeles Wholesale Produce Market (LAWPM) operates a historic produce market on Parcels 1 and 2. Defendants Atlas Capital Group LLC (Atlas) and Alameda Square Owner LLC (Alameda) (collectively, Defendants) operate another historic produce market on neighboring Parcel A, and have redeveloped the property on neighboring Parcels B and C into a commercial development known as "Row DTLA."[1] A dispute arose between the parties over the scope of Defendants' rights to use certain easements over Parcel 1 as a means of egress from Parcels B and C, and to remove an access gate operated by LAWPM.

LAWPM thereafter filed this action against Defendants, alleging claims for declaratory relief, injunctive relief, quiet title, and breach of contract. The trial court entered judgment in favor of LAWPM on the declaratory relief, injunctive relief, and quiet title claims, and in favor of Alameda on the breach of contract claim. Both LAWPM and Defendants appeal from the judgment. LAWPM also appeals from a postjudgment award of attorneys' fees to Alameda. For the reasons set forth below, we affirm the judgment, and modify Alameda's fee award to strike certain amounts that were not consistent with the trial court's ruling.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.    **The Relevant Agreements**

The parties' rights with respect to the properties at issue in this case are governed by a series of written agreements between

_____

[1] Atlas is a private equity company that invests in real estate projects across the country, and Alameda is organized by Atlas to hold title to the Row DTLA parcels at issue in this case.

2

their predecessors-in-interest.  The following is a summary of the relevant agreements:

A.    ***The 1982 Ground Lease***

In 1982, Southern Pacific Transportation Company (SPTC), then the fee owner of Parcel 1[2] as well as Parcels A, B, and C, entered into a ground lease agreement with the Los Angeles Wholesale Produce Market Development Corporation (LAWPMDC), whereby SPTC leased Parcel 1 to LAWPMDC (the "1982 Ground Lease").  The following year, the 1982 Ground Lease was amended to provide that SPTC, as the lessor of Parcel 1, reserved the non-exclusive right to use a certain portion of the leased premises, referred to as the "Joint Use Area," for "pedestrian and vehicular ingress to and egress from Parcels A, B, and C" (the "1983 Amendment").  Plaintiff LAWPM is the assignee of, and successor to, LAWPMDC's interest in the 1982 Ground Lease.  The lease term expires in 2048.

B.    ***The 1983 Reciprocal Easement Agreement***

In 1983, SPTC, as the owner of Parcel 1 and Parcels A, B, and C, entered into a reciprocal easement agreement with the Community Redevelopment Agency of the City of Los Angeles (CRA), which then owned Parcel 2, whereby SPTC and CRA granted each other, and their respective successors and assigns, easements over certain sections of Eighth Street between Central Avenue and Alameda Street (the "1983 Reciprocal Easement Agreement").  These sections of Eighth Street, which bordered Parcel 1 and Parcel A to the north and Parcel 2 to the south, previously had been encumbered with public street easements

---

[2] Parcel 1 is sometimes referred to as Parcel D in the relevant agreements.

3

that were being vacated by the City of Los Angeles. Subject to the terms of the 1983 Reciprocal Easement Agreement, the vacated portions of Eighth Street became a private road under the control of the owners of the respective bordering properties.

C. ***The 1991 Grant Deed and Easement Agreement***

NewLowe Properties (NewLowe) later became the fee owner of Parcel 1 and Parcels A, B, and C. In May 1991, NewLowe conveyed its fee simple interest in Parcels B and C to Rykoff-Sexton, Inc. (Rykoff) pursuant to a grant deed (the "1991 Grant Deed"), while retaining ownership of Parcel 1 and Parcel A. As part of the 1991 Grant Deed, NewLowe also conveyed to Rykoff certain limited easements over Parcel 1 and Parcel A for the benefit of Parcels B and C, including three easements known as (1) the Eighth Street Easement, (2) the Truck Easement, and (3) the Track Street West Easement.

A concurrently recorded easement agreement between NewLowe and Rykoff dated May 8, 1991 (the "1991 Easement Agreement") "set forth . . . all of the covenants and conditions respecting the use, maintenance and operation of the Easements." The 1991 Easement Agreement stated that "[t]he provisions of this Agreement shall inure to the benefit of, and shall bind the Parties and their respective personal representatives, successors and assigns." It also provided that "[a]ll of the covenants, agreements, conditions and restrictions set forth in this Agreement are intended to be and shall be construed as covenants running with the land, binding upon, inuring to the benefit of and enforceable by the Parties hereto and all subsequent owners or lessees of, or any party having an interest in, their respective Parcels or any parts thereof."

### 1. The Eighth Street Easement

With respect to the Eighth Street Easement, the 1991 Easement Agreement provided that "Rykoff shall use the Eighth Street Easement solely as a means of: (1) ingress to or egress from the Rykoff Parcel for trucks and other vehicles via the Truck Easement . . . or (2) ingress for trucks and other vehicles to the Rykoff Parcel via the Track Street West Easement." The 1991 Easement Agreement also stated that "Rykoff's use of the Eighth Street Easement Area shall be non-exclusive, and in common with the use as a roadway by NewLowe."

### 2. The Truck Easement

With respect to the Truck Easement, the 1991 Grant Deed conveyed to Rykoff "[a] non-exclusive easement (the 'Truck Easement') for vehicular and truck ingress and egress over a strip of land at least 20 feet in width." The 1991 Easement Agreement restricted Rykoff's use of the Truck Easement, in pertinent part, as follows: "Rykoff shall use the Truck Easement solely as a secondary right-of-way for trucks entering or leaving the Rykoff Parcel, and not for any other purpose; in particular, Rykoff shall not have the right to use the area within such Easement . . . as a primary means of ingress or egress for trucks or any other vehicles to and from the Rykoff Parcel."

### 3. The Track Street West Easement

With respect to the Track Street West Easement, the 1991 Grant Deed conveyed to Rykoff "a non-exclusive easement (the 'Track Street West Easement') for vehicular right-of-way which shall be one-way from Eighth Street to Seventh Street (but such traffic direction may be reversed in accordance with Section 1.8 of

5

the Easement Agreement to be recorded concurrently herewith) over . . . [a] ten-foot wide strip of land."[3]

The 1991 Easement Agreement also placed several restrictions on Rykoff's use of the Track Street West Easement. It particular, it provided that "Rykoff's use of the Track Street West Easement shall be limited to the hours of 8:00 a.m. to 12:00 midnight, Pacific Time, each day, and shall be subject to the following restrictions: [¶] (i) such Easement shall serve as a primary means of ingress and egress only for trucks and other vehicles entering the Rykoff Parcel for purpose of loading or unloading at the 15 foot wide strip of land within the northwesterly portion of Parcel B of the Rykoff Parcel . . . (the 'Tank Car Loading Area'); and [¶] (ii) such Easement shall serve as a secondary means of ingress and egress for trucks and other vehicles entering the Rykoff Parcel for purposes other than loading or unloading in the Tank Car Loading Area (it being the intention of the Parties that Rykoff will use all reasonable efforts to utilize Alameda and Seventh Street as the usual means of access to all of the Rykoff Parcel except the Tank Car Loading Area)." The 1991 Easement Agreement further stated that "Rykoff shall not use the area of the Track Street Easement (the 'Track Street Easement Area') for any other

---

[3] Section 1.8 of the 1991 Easement Agreement stated, in relevant part, that "[a]t any time after one year from the recordation of the Deed (but not more than once in any 12-month period), NewLowe shall have the right to change the direction of the one-way flow of traffic over the Track Street West [Easement]" provided that "[n]o such change shall be made without Rykoff's prior written consent, which consent shall not be unreasonably withheld."

6

purpose or at any other time including: (i) as a means of egress from the Rykoff Parcel or (ii) for the parking, queuing, loading or unloading of trucks or any other vehicles, or in any other manner which would materially obstruct the use by NewLowe of the Track Street West Easement Area as a means of ingress and egress into and out of the NewLowe Parcel."

D.   ***The 1993 Settlement Agreement***

In October 1991, NewLowe conveyed its fee simple interest in Parcel 1 to O Hill Properties, The O Hill Company, Bear Brand Ranch Company, and Isador C. Myers (collectively, O Hill) pursuant to a grant deed, while retaining ownership of Parcel A. In a concurrently recorded assignment agreement dated October 10, 1991, O Hill assumed the rights and obligations of NewLowe under the 1982 Ground Lease.

In 1992, NewLowe, then the owner of Parcel A, filed a lawsuit against LAWPMDC, then the lessee of Parcel 1, and other affiliated parties (collectively, the LA Market Group).  On December 3, 1993, NewLowe and the LA Market Group entered into a Settlement, Mutual Access, and Easement Modification Agreement (the "1993 Settlement Agreement") to resolve their dispute and to "modify their rights, interests and obligations with respect to the Original 8th St. Easement and Original Joint Use Area."

Among other provisions, the parties to the 1993 Settlement Agreement agreed to change the "Original Joint Use Area" to three new areas known as the "LA Market Use Area," the "NewLowe Use Area," and the "New Joint Access Area." NewLowe released all rights and interest in the LA Market Use Area for the duration of the 1982 Ground Lease, and the LA Market Group released all rights and interest in the NewLowe

Use Area. With respect to the New Joint Access Area, the parties agreed, in relevant part, as follows: "The portion of the Original Joint Use Area crosshatched on Exhibit '10' hereto shall be deemed to be the New Joint Access Area. The New Joint Access Area shall be used for ingress and egress to and from the 7th St. Market and for truck maneuvering by NewLowe and its Representatives. The LA Market Tenants shall have the nonexclusive right to use the New Joint Access Area solely for ingress and egress to and from the 7th St. Market, solely to the extent they are permitted to have access to the 7th St. Market Common Area. . . . Rykoff-Sexton, Inc. ('Rykoff') and SPTC also shall have nonexclusive access rights over the New Joint Access Area, solely to the extent required under written agreements recorded prior to the Execution Date."[4]

Section 8 of the 1993 Settlement Agreement also included the following provision regarding certain gates located on 8th Street: "LA Market Group shall maintain the existing gate at the intersection of the former 8th Street and Central Avenue (the '8th-Central Gate') and the gate at Alameda Street and the former 8th Street and (the 'Alameda Gate' and, jointly with the 8th-Central Gate, the 'Gates'), at its sole cost and expense. LA Market Group shall keep the Gates open during the following hours and days of business operations: 10:00 p.m. each day of the week and closing at 12:00 p.m. Sunday through Friday, and

---

[4] Exhibit 10 to the 1993 Settlement Agreement showed the locations of the LA Market Use Area, NewLowe Use Area, and New Joint Access Area, each of which was located on Parcel 1. Exhibit 10 did not show the location of the Original Joint Use Area, or any of the easements granted to Rykoff in the 1991 Grant Deed.

opening 10:00 p.m. and closing at 10:00 a.m. Saturday, excluding holidays observed by both the LA Market and the 7th St. Market ('Normal Hours'). All installation, maintenance and other costs associated with the Gates shall be borne by LA Market Group. All maintenance costs, insurance costs, property taxes and other costs and expenses incurred in connection with the Reduced Shared 8th St. Area other than in connection with the 8th-Central Gate shall be allocated among the parties in the manner set forth in the REA."

Section 8 of the 1993 Settlement Agreement further provided: "NewLowe and LAWPM each shall have the right, but not the obligation, to reconfigure the 8th-Central Gate in any of the locations shown on Exhibit '9' hereto, upon 14 days' prior written notice to the other party of its election to do so and at the sole cost of the electing party. The electing party shall thereafter be responsible for the costs of removing the original fence and all installation, maintenance and other costs incurred in connection with the reconfigured fence. The electing party shall keep the reconfigured fence open during Normal Hours."

## II.    Current Ownership of the Properties

Alameda Produce Market, Inc. subsequently acquired a fee simple ownership interest in Parcel A from NewLowe, and in Parcels B and C from Rykoff. In 2014, the successor-in-interest to Alameda Product Market, Inc., transferred its fee simple ownership interest in Parcels A, B, and C to defendant Alameda. Alameda is the current fee owner of Parcels A, B, and C.

O Hill remains the current fee owner of Parcel 1 subject to the 1982 Ground Lease. In 2003, the City of Los Angeles granted a fee simple ownership interest in Parcel 2 to LAWPM. LAWPM

9

is the current lessee of Parcel 1, and the current fee owner of Parcel 2.

## III. Current Dispute Between the Parties

LAWPM operates a large produce market on Parcels 1 and 2. Alameda currently operates a smaller produce market, the 7th Street Market, on Parcel A. Alameda has redeveloped Parcels B and C into a mixed-use commercial development known as Row DTLA, which houses offices, restaurants, and retail shops. As part of the Row DTLA project, Alameda constructed a 10-story parking garage on Parcel B. Alameda thereafter sought to allow vehicles exiting the parking garage on Parcel B to access Central Avenue from 8th Street via the easements that crossed over Parcel 1. Since 1986, however, access to Central Avenue from 8th Street had been restricted by the 8th-Central Gate, which LAWPM kept open during normal business hours for its produce market and locked at all other times.

In a letter dated March 25, 2016, Jenni Harris, Atlas's Director of Property Management, provided LAWPM with the terms of a proposal for allowing Row DTLA unrestricted access to Central Avenue through the 8th-Central Gate. As set forth in that letter, if LAWPM agreed (1) to give Row DTLA keys to the 8th-Central Gate and certain other interior gates, (2) to share the costs of a security guard to man the 8th-Central Gate during the hours that it was normally locked, and (3) to permit the installation of new gate along the New Joint Access Area, then Row DTLA would allow LAWPM to continue operating the 8th-Central Gate in its current location, and would relinquish its rights under the 1993 Settlement Agreement to remove and relocate the 8th-Central Gate. If, however, LAWPM did not agree to allow Row DTLA to have unrestricted access to Central

10

Avenue, then Row DTLA would exercise its right to remove the 8th-Central Gate and relocate it in accordance with the 1993 Settlement Agreement. It is undisputed that LAWPM did not agree to these proposed terms.

In June 2016, the parties' respective counsel exchanged written correspondence about the 8th-Central Gate. In a letter to LAWPM's counsel dated June 17, 2016, Alameda's counsel provided notice that "if LAWPM fails to agree to our client's most recent offer . . . by the close of business Wednesday, June 22, 2016, our client will remove the [8th-Central] Gate in accord with Section 8 of the [1993] Settlement Agreement." In a response letter dated June 22, 2016, LAWPM's counsel asserted that "[t]he current gate location and hours of operation have satisfied and continue to satisfy the needs of the only intended users of the [8th-Central] Gate – the LA Wholesale Produce Market . . . and the 7th Street Market; relocation is neither necessary nor warranted." LAWPM's counsel also stated that "LAWPM continues to strongly disagree that your client has the right pursuant to the 1993 Settlement . . . Agreement or otherwise to remove, relocate, or reconfigure the [8th-Central] Gate."

It is undisputed that, on July 10, 2016, Alameda removed the 8th-Central Gate without LAWPM's consent. It is also undisputed that Alameda did not relocate or reconfigure the 8th-Central Gate in any of the locations shown on exhibit 9 of the 1993 Settlement Agreement.

IV. **LAWPM's Lawsuit Against Defendants**

On July 25, 2016, LAWPM filed this action against Alameda and Atlas. LAWPM's first amended complaint alleged causes of action for (1) declaratory relief regarding the Truck Easement; (2) declaratory relief regarding the Track Street West

11

Easement; (3) quiet title, (4) injunctive relief, and (5) breach of written contract. The first through fourth causes of action concerned the parties' rights with respect to the easements granted pursuant to the 1991 Grant Deed and the 1991 Easement Agreement. The fifth cause of action pertained to Alameda's alleged breach of the 1993 Settlement Agreement by failing to pay security costs incurred by LAWPM in connection with the removal of the 8th-Central Gate.[5]

A. *Summary Adjudication on First and Fourth Causes of Action*

On August 16, 2017, the trial court granted LAWPM's motion for summary adjudication as to the first and fourth causes of action, and denied the motion as to the second, third, and fifth causes of action.

As to the first cause of action for declaratory relief regarding the Truck Easement, the court entered declaratory relief as follows: "With respect to the Truck Easement, . . . (1) Defendants' rights in and to the Truck Easement are limited to a secondary right-of-way for trucks entering or leaving 'Parcel B' and 'Parcel C' . . .; (2) the Truck Easement does not grant Defendants a primary means of ingress or egress to or from 'Parcel B' and 'Parcel C' for trucks; and (3) the Truck Easement does not grant Defendants ingress or egress to or from 'Parcel B' and 'Parcel C' for any other non-truck vehicles or pedestrian traffic."

As to the fourth cause of action for injunctive relief, the court issued a permanent injunction that prohibited Defendants

---

[5] The fifth cause of action for breach of contract was alleged against Alameda only.

from: (1) "utilizing the Truck Easement . . . for any purpose other than as a secondary right-of-way for trucks entering or leaving Parcels B and C"; and (2) "utilizing the Track Street West Easement . . . for any purpose other than as a primary means of access for trucks and other vehicles entering Parcels B and C for purposes of loading or unloading at the . . . 'Tank Car Loading Area' . . . , or as a secondary means of ingress and egress for trucks and other vehicles entering Parcels B and C for purposes other than loading or unloading in the Tank Car Loading Area."

B. ***Trial on Second and Third Causes of Action[6]***

In November 2017, the trial court held a bench trial on the second cause of action for declaratory relief regarding the Track Street West Easement and the third cause of action for quiet title. On December 15, 2017, the court issued a tentative statement of decision in favor of LAWPM, which became the final statement of decision. One of the central disputed issues at the trial was whether, under the 1991 Grant Deed and 1991 Easement Agreement, LAWPM's consent was required for Defendants to reverse the flow of traffic on the one-way Track Street West Easement from a northeast to a southwest flow.[7] In its statement of decision, the court found that LAWPM's consent

---

[6] On its own motion, the trial court bifurcated the trial on the equitable and legal claims, and ordered that a bench trial on the equitable claims would occur first.

[7] In order for vehicles exiting the Row DTLA parking garage on Parcel B to access Central Avenue from Eighth Street, as desired by Defendants, the flow of traffic on the Track Street West Easement would have to be reversed to a southwest flow.

13

to reverse the flow of traffic on the Track Street West Easement was required, and that LAWPM had not provided such consent.

As to the second cause of action for declaratory relief regarding the Track Street West Easement, the court entered declaratory relief as follows: "Defendants' rights in and to the Track Street West Easement . . . are (1) limited to the uses set forth in the 1991 Grant Deed and Section 1.3 of the 1991 Easement Agreement; and (2) during the period of LAWPM's lease of Parcel 1, the flow of one-way traffic on the Track Street West Easement shall be from the southwest to northeast unless Alameda (or other successor-in-interest to Parcel A) and LAWPM (or other successor-in-interest to the lease to Parcel 1) agree in writing to change the flow of one-way traffic to a southwest flow pursuant to Section 1.8 of the 1991 Easement Agreement."

As to the third cause of action for quiet title, the court found that, because LAWPM had prevailed on its declaratory relief claims regarding the Truck Easement and the Track Street West Easement, LAWPM also had prevailed on its quiet title claim. The court granted LAWPM declaratory and injunctive relief, as set forth in the statement of decision and the court's prior order on LAWPM's motion for summary adjudication.

C. *Trial on Fifth Cause of Action*

In October 2018, the fifth cause of action for breach of contract was tried before a jury.[8] At the conclusion of the trial,

_____

[8] In a pretrial conference with counsel, the trial court noted that the proper interpretation of a contract was a question of law for the court unless there was conflicting extrinsic evidence on the contract's meaning. However, the court stated that "it still would be helpful for everybody to get a jury verdict" as to the amount of damages because the losing party was likely to appeal

14

the jury rendered special verdict findings in favor of Alameda with respect to both liability and damages. As to liability, the jury found that Alameda was not required under the 1993 Settlement Agreement to pay for any additional security services that LAWPM incurred as a result of the removal of the 8th-Central Gate. As to the amount of any damages, the jury found that the cost of any additional security services that LAWPM incurred as a result of the removal of the 8th-Central gate was $0.[9]

Following the jury's special verdict, the trial court ruled that the question of Alameda's liability for breach of contract was a matter for the court to decide because no extrinsic evidence had been presented at the jury trial relevant to interpretation of the 1993 Settlement Agreement. The parties submitted extensive briefing on the question of liability, and the court held multiple hearings on the matter.

The court ultimately found that Alameda was not liable for breach of contract because LAWPM had prevented Alameda from reconfiguring the 8th-Central Gate in accordance with the 1993 Settlement Agreement. In making this finding, the court relied on the June 2016 correspondence between the parties' respective counsel, which had been admitted at the jury trial over LAWPM's

---

any finding as to liability, and thus, "why not have the jury decide the thing we all agree that the jury has to decide[.]"

[9] As discussed in greater detail below, the jury was asked to provide an answer as to the amount of additional security costs incurred by LAWPM, irrespective of the jury's prior determination of whether Alameda was required to pay those costs.

15

objections, for the limited purpose of showing the positions of the parties at that time. The court explained that Alameda would have breached the agreement if it had simply removed the 8th-Central gate and done nothing else; however, the attorney correspondence showed that Alameda offered to install a new gate in accordance with the 1993 Settlement Agreement, and by refusing that offer, LAWPM had prohibited Alameda from doing so. The court also found that, independent of its finding on liability, Alameda was entitled to judgment on the breach of contract claim because the jury found that LAWPM did not incur any additional security costs as a result of the removal of the 8th-Central gate.

### D. *Posttrial Motions*

On May 14, 2019, the trial court entered judgment in favor of LAWPM on the first through fourth cases of action for declaratory relief, injunctive relief, and quiet title. The court entered judgment in favor of Alameda on the fifth cause of action for breach of contract.

Both LAWPM and Defendants thereafter moved for a new trial. In its motion, LAWPM requested a new trial on the breach of contract claim. LAWPM contended, among other arguments, that the jury instructions were misleading and confusing because they were inconsistent with the special verdict form. In their motion, Defendants sought a new trial on the declaratory relief and quiet title claims. Defendants specifically challenged the trial court's finding that the evidence failed to establish the location of the Joint Use Area, which Defendants claimed was relevant to LAWPM's standing to enforce the restrictions on the Track Street West Easement. The trial court denied both new trial motions.

16

Both LAWPM and Defendants also filed motions for attorneys' fees. The trial court awarded LAWPM attorneys' fees in the amount of $1,061,060.25 as the prevailing party on the first through fourth causes of action. The court awarded Alameda attorneys' fees in the amount of $804,461.20 as the prevailing party on the fifth cause of action.

### E. *Appeals*

LAWPM filed an appeal from the judgment entered in favor of Alameda on the fifth cause of action, and an appeal from the postjudgment order awarding attorneys' fees to Alameda. Defendants filed a cross-appeal from the judgment entered in favor of LAWPM on the first through fourth causes of action. We granted LAWPM's motion to consolidate these appeals.

## DISCUSSION

### I. LAWPM's Appeal from the Judgment in Favor of Alameda on the Fifth Cause of Action

In its appeal from the judgment entered in favor of Alameda on the fifth cause of action for breach of contract, LAWPM challenges both the trial court's finding of no liability and the jury's finding of no damages.

As to liability, LAWPM claims that (1) the evidence was insufficient to support the trial court's finding that Alameda did not breach the 1993 Settlement Agreement because LAWPM prevented Alameda from performing under the contract; and (2) the trial court erred in admitting into evidence and relying on the written correspondence between the parties' attorneys to find that Alameda was not liable for breach of contract.

As to damages, LAWPM contends that (1) the evidence was insufficient to support the jury's special verdict finding that LAWPM did not suffer any damages; (2) the jury instructions and

17

the special verdict form were misleading and confusing because they were inconsistent with one another; and (3) the trial court erred in refusing to allow LAWPM to display a demonstrative exhibit that included simple calculations of the security costs it had incurred as a result of the removal of the 8th-Central Gate.

We conclude that LAWPM has failed to demonstrate any reversible error with respect to the jury's special verdict finding that LAWPM did not suffer damages. Because the jury's finding as to damages provides a sufficient independent basis for affirming the judgment in favor of Alameda on the fifth cause of action, we do not address LAWPM's arguments regarding the trial court's separate finding as to liability.

A. ***Relevant Facts***

1. **Jury Trial Evidence**

At the jury trial on the breach of contract claim, LAWPM presented the testimony of Richard Gardner to prove that it sustained damages as a result of Alameda's removal of the 8th-Central Gate. Gardner testified that his company manages LAWPM, and is in charge of security for the market. The normal business hours of the market are 10:00 p.m. to 12:00 p.m. Monday through Friday. The market closes at 12:00 p.m. on Saturday and reopens at 10:00 p.m. on Sunday. The 8th-Central Gate was installed when LAWPM opened in 1986, and had been in place continuously until Alameda removed the gate on July 10, 2016. Prior to its removal, the 8th-Central Gate was open when the market was open, and was locked when the market was closed. A security guard was stationed at the gate only during the hours that the market was open.

Gardner testified that, due to increased security concerns stemming from the removal of the 8th-Central Gate, LAWPM has

18

been required to keep a security guard stationed at the former location of the gate 24 hours a day, seven days a week. A 24-hour security guard was added to that location immediately following the removal of the gate. Gardner also testified that he personally reviews and pays the security invoices on behalf of LAWPM. According to Gardner, LAWPM needed a security guard for an additional 72 hours per week as a result of the removal of the 8th-Central Gate. From July 10, 2016 to July 15, 2018, the cost of the additional security was $16.85 per regular hour, and $25.28 per holiday hour. On July 15, 2018, this amount increased to $21.60 per regular hour and $32.40 per holiday hour because LAWPM changed security companies. Based upon these hours and rates, the total amount that LAWPM had paid for additional security to date as a result of the removal of the 8th-Central Gate was $152,323.72.

Gardner further testified that, in a letter to Alameda's counsel dated December 14, 2016, LAWPM demanded payment for the additional security costs it had incurred through that date due to the removal of the 8th-Central Gate. LAWPM's demand letter attached a one-page spreadsheet showing the hourly rates, weekly hours, and total amount it had paid for the additional security. Gardner confirmed that he reviewed the spreadsheet before it was sent with the demand letter, and that the hours, rates, and calculations included in the document were correct. It is undisputed that Alameda never paid any of the security costs demanded by LAWPM in connection with the 8th-Central Gate.

On cross-examination, Gardner acknowledged that the spreadsheet that was attached to LAWPM's December 14, 2016 demand letter was prepared by his assistant, and that he did not know what documents, if any, the assistant had used to prepare

19

the spreadsheet. Although Gardner "looked" at the spreadsheet before it was sent, he "didn't do the math" himself or review the invoices submitted by the security company. Gardner also did not know what type of records the security company provided to LAWPM to substantiate its bills for service. In addition, Gardner admitted that he did not know how many roving security guards were present at LAWPM during the hours that the market was open or closed. Apart from the security that was added at the former location of the 8th-Central Gate, Gardner also did not know whether the total number of security guards present at LAWPM at any given time had changed since the gate's removal.

During her testimony, Harris, Atlas's Director of Property Management, acknowledged that a regular rate of $16.85 and a holiday rate of $25.28 were not unreasonable hourly rates of pay for security guards, and that these rates were within the range that Defendants paid to the security guards on their properties. Harris testified, however, that LAWPM never provided Defendants with invoices showing the actual amounts that LAWPM had paid for additional security as a result of the removal of the 8th-Central Gate.

## 2. Jury Instructions and Special Verdict

At the close of the evidence, the jury was instructed on the breach of contract claim with, among other standard instructions, CACI Nos. 300, 303, and 350. CACI No. 300 instructed the jury: "The Los Angeles Wholesale Produce Market claims that its prior owner and Alameda Square Owner's prior owner entered into a contract . . . which outlined the parties' rights and responsibilities with respect to a gate known as the 8th-Central Gate. [¶] The Los Angeles Wholesale Produce Market claims that defendant Alameda Square Owner breached this contract by failing to pay

20

reasonably necessary additional security costs incurred by the Los Angeles Wholesale Produce Market in connection with Alameda Square Owner's removal of the 8th-Central Gate.  [¶] Alameda Square Owner denies these claims."

CACI No. 303 set forth the essential elements of the breach of contract claim as follows:  "To recover damages from Alameda Square Owner for breach of contract, the Los Angeles Wholesale Produce Market must prove all of the following:  [¶]  1[.] That Alameda Square Owner failed to do something that the contract required it to do; [¶] 2[.] That the Los Angeles Wholesale Produce Market was harmed by Alameda Square Owner's breach of contract; and [¶] 3[.] That Alameda Square Owner's breach of contract was a substantial factor in causing the Los Angeles Wholesale Produce Market's harm.

CACI No. 350 on damages for breach of contract provided, in relevant part:  "If you decide that the Los Angeles Wholesale Produce Market has proved its claim against Alameda Square Owner for breach of contract, you also must decide how much money will reasonably compensate the Los Angeles Wholesale Produce Market for the harm caused by the breach.  This compensation is called 'damages.'  The purpose of such damages is to put the Los Angeles Wholesale Produce Market in as good a position as it would have been if Alameda Square Owner had performed as promised.  [¶]  To recover damages for any harm, the Los Angeles Wholesale Produce Market must prove that when the contract was made, both parties knew or could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as a result of the breach of contract. . . . [¶]  The Los Angeles Wholesale Produce Market claims damages

21

for additional security costs incurred as a result of Alameda Square Owner's removal of the 8th-Central Gate."

The jury also was provided with a three-question special verdict form that had been amended by the trial court and approved by counsel for LAWPM.[10]  The first question on the verdict form asked the jury:  "1.  Was Alameda Square Owner required under the 1993 Agreement to pay for any additional security services the Los Angeles Wholesale Produce Market incurred as a result of the removal of the 8th-Central gate?"  By a nine to three vote, the jury answered "No" in response to question 1.

The verdict form next asked the jury:  "Whether your answer to question 1 is yes or no:  2.  What is the cost, if any, of additional security services [t]he Los Angeles Wholesale Produce [Market] incurred as a result of the removal of the 8th-Central gate?"  By a nine to three vote, the jury answered "$0" in response to question 2.

The third question on the verdict form concerned the mitigation of damages by LAWPM.  Because the verdict form instructed the jury not to answer any further questions if its answer to question 2 was zero, the jury did not respond to question 3.

_____

[10] Although the record does not include any of the verdict forms originally proposed by the parties, it appears that both LAWPM and Defendants submitted special verdict forms to the trial court for approval, and that the trial court made revisions that resulted in the amended special verdict form that was ultimately given to the jury.  While defense counsel objected to certain language in the amended verdict form, LAWPM's counsel told the court, "Your Honor, we're fine with the verdict form."

B.    ***The Evidence Does Not Compel a Damages Finding in Favor of LAWPM as a Matter of Law***

LAWPM first challenges the sufficiency of the evidence supporting the jury's special verdict finding that the cost of any additional security services that LAWPM incurred as a result of the removal of the 8th-Central Gate was zero. Specifically, LAWPM contends that the undisputed evidence established that it incurred $152,323.72 in additional security costs as a result of the removal of the gate, and thus, the jury's finding of no damages was not supported by substantial evidence.

"The plaintiff in a breach of contract action has the burden of proving nonspeculative damages with reasonable certainty." (*Copenbarger v. Morris Cerullo World Evangelism, Inc.* (2018) 29 Cal.App.5th 1, 11.) Proof of damages is an essential element of a breach of contract claim. (*Id.* at p. 15; *Pech v. Morgan* (2021) 61 Cal.App.5th 841, 855.) "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." (Civ. Code, § 3301.)

" 'In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." [Citations.] Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels a finding in favor of the appellant as a matter of law*." [Citation.] Specifically, we ask "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Estes v. Eaton Corp.* (2020)

23

51 Cal.App.5th 636, 651; accord, *Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163-164.) "This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing plaintiff to meet, because unless the trier of fact made specific factual findings in favor of the losing plaintiff, we presume the trier of fact concluded that 'plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof.' " (*Estes*, at p. 651.)

Here, LAWPM bore the burden of proving that it sustained damages as a result of Alameda's breach of the 1993 Settlement Agreement. At trial, LAWPM's proof of damages came solely from the testimony of Gardner. Gardner testified that LAWPM incurred a total of $152,323.72 in additional security costs as a result of the removal of the 8th-Central Gate. He also testified that this sum was calculated by multiplying the applicable hourly rate that LAWPM paid to its security guards by the additional hours that were required to keep a 24-hour security guard stationed at the former location of the 8th-Central Gate.

LAWPM argues that Gardner's testimony provided uncontroverted evidence to support its damages claim. It is well-established, however, that " '[s]o long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citations.] Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 422; see *Estes v. Eaton Corp.*, *supra*, 51 Cal.App.5th at p. 651 [" 'the jury is not required to believe the

testimony of any witness, even if uncontradicted' "]; *Palmieri v. State Personnel Bd.* (2018) 28 Cal.App.5th 845, 857 [" '[p]rovided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted' "].)

Although Gardner's testimony regarding the amount of additional security costs that LAWPM incurred was not contradicted by other witnesses, the jury still rationally could have chosen to reject such testimony. On cross-examination, Gardner admitted that he did not know how many roving security guards were working at LAWPM at any given time, and whether the total number of guards present on the property had changed as a result of the removal of the 8th-Central Gate. Gardner also admitted that he did not personally prepare the spreadsheet of security costs that was included with LAWPM's December 14, 2016 demand for payment, nor did he review any security invoices or other documents in connection with that demand. Defense counsel also elicited testimony that LAWPM never provided Defendants with any of the invoices that would show the actual costs that LAWPM had incurred for additional security as a result of the removal of the 8th-Central Gate.

In her closing argument, defense counsel emphasized the lack of supporting evidence to corroborate Gardner's testimony about these costs. In particular, defense counsel told the jury: "There was no evidence other than the bare statement that 'we pay $16.85 an hour and something higher on weekends and holidays and that in fact was an additional guard.' [¶] Mr. Gardner's testimony, unsupported by invoices, unsupported by timesheets, log-in cards, anything at all that would show to you or us that, A, it was an additional guard, B, this is what we paid

-- I submit to you that if somebody sends you a bill just saying 'here it is, I say this is what it is so it must be,' you might have some questions about that. [¶] So, I believe the answer to question no. 2 should be zero because there is a lack of evidence."

On this record, we cannot conclude that the jury acted arbitrarily or without any rational basis in declining to credit Gardner's testimony about the damages allegedly suffered by LAWPM as a result of the removal of the 8th-Central Gate. "We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) Because the jury rationally could find that LAWPM did not meet its burden of proving damages for breach of contract, the evidence does not compel a finding in favor of LAWPM on the element of damages as a matter of law.

C.     ***The Jury Instructions and Special Verdict Form Were Not Inconsistent, Misleading, or Confusing***

LAWPM next argues that the instructions and special verdict form given to the jury were misleading and confusing because the instructions on breach of contract were inconsistent with the questions on the verdict form. In particular, LAWPM asserts that, based on the language of the instructions and the special verdict form, the jury was necessarily required to find no damages in response to question 2 as a result of finding no liability for breach the contract in response to question 1.

" 'The propriety of jury instructions is a question of law that we review de novo.' " (*Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1187; accord, *Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 969.) In general, " '[a] party is entitled upon request to correct, nonargumentative instructions on every

theory of the case advanced by him [or her] which is supported by substantial evidence.' " (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1045.) " '[A]n instruction correct in the abstract, may not be given where it is not supported by the evidence or is likely to mislead the jury.' " (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 619.) However, " '[a] party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law.' " (*Jackson*, at p. 1187.) Even where there is instructional error, reversal is not warranted unless it is reasonably probable that the jury may have based its verdict on the erroneous instruction. (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) "That assessment, in turn, requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled." (*Soule*, at p. 574.)

The correctness of a special verdict also "is analyzed as a matter of law and therefore subject to de novo review." (*Jackson v. AEG Live, LLC, supra*, 233 Cal.App.4th at p. 1187; accord, *Martinez v. Rite Aid Corp., supra*, 63 Cal.App.5th at p. 969.) "Before a judgment on a special verdict may be entered, the 'jury's special verdict findings must be internally consistent and logical.' " (*Missakian v. Amusement Industry, Inc.* (2021) 69 Cal.App.5th 630, 654.) " 'A special verdict is inconsistent if there is no possibility of reconciling its findings with each other.' " (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1038.) "If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no

27

party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357-358, fn. omitted.)

Defendants claim that LAWPM forfeited any objection to the special verdict form because LAWPM expressly agreed to the amended verdict form that was submitted to the jury. LAWPM, on the other hand, contends that it only acquiesced to that form after the trial court rejected the versions proposed by the parties in favor of rewriting its own special verdict form. LAWPM also asserts that it preserved the issue for appeal by raising it in a motion for new trial. Although the failure to object to the form of a verdict before the jury is discharged may constitute a waiver or forfeiture of any defect, "waiver is not automatic, and there are many exceptions," such as "where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' " (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2; see *Simgel Co., Inc. v. Jaguar Land Rover North America, LLC* (2020) 55 Cal.App.5th 305, 319.) As LAWPM notes, some courts also have declined to find waiver or forfeiture where an objection to the verdict form was raised for the first time in a posttrial motion before the trial court. (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1220 [challenge to form of verdict preserved by raising it in motion for new trial]; *Mixon v. Riverview Hospital* (1967) 254 Cal.App.2d 364, 376-377 [same].) In this case, however, we need not decide whether LAWPM forfeited its challenge to the verdict form by failing to object before the jury was discharged. Even assuming LAWPM

28

preserved its claim by asserting it in the motion for new trial, the claim fails on the merits.

In challenging the special verdict finding as to damages, LAWPM does not contend that either the jury instructions or the special verdict form incorrectly stated the law. Rather, LAWPM argues that the instructions given to the jury conflicted with the questions on the special verdict form because the instructions told the jury that LAWPM could only recover damages if it proved Alameda breached the contract, whereas the verdict form asked the jury to consider the question of damages independently from the question of breach. LAWPM asserts that, because the jury found that Alameda did not breach the contract in response to question 1 on the verdict form, the instructions required the jury to also find that LAWPM did not sustain any damages in response to question 2. We disagree.

The special verdict form, and the trial court's instructions to the jury, made clear that the jury was to decide the question of damages separately and independently from the question of breach. The special verdict form was narrowly tailored to the facts of the case, and was comprised of only three questions. Question 1 concerned breach, and asked whether Alameda was required under the 1993 Settlement Agreement to pay for any additional security services that LAWPM incurred as a result of the removal of the 8th-Central Gate. Question 2 addressed damages, and asked the jury to decide the cost, if any, of the additional security services that LAWPM incurred as a result of the removal of the 8th-Street Gate. The special verdict form plainly stated that "[w]hether your answer to question 1 is yes or no," the jury was required to answer question 2.

29

Before reading the CACI instructions to the jury, the trial court went over the questions on the special verdict form so that the jury would understand what it was required to do. The court explained that question 1 on the special verdict form concerned whether Alameda was required to pay for the expenses incurred by LAWPM as a result of the removal of the 8th-Central Gate. The court then told the jury: "Independent of that question, no. 2 is we want you to tell us whether you believe additional expenses or costs were incurred as a result of the removal of the gate." The court later reminded the jury that it must follow the instructions on the special verdict form and consider each question separately, and that "after you answer a question, the form tells you what to do next." When defense counsel mistakenly stated during her closing argument that "you don't have to get to number 2 if you say no to number 1" on the verdict form, the court immediately interjected to correct her, and again reiterated to the jury that question 2 on the verdict form was "independent" of question 1. During its deliberations, the jury never asked the court for clarification on the instructions or the verdict form, or gave any indication that it was confused by either of them.

In support of its argument that the jury must have been confused in answering the questions on the special verdict form, LAWPM points to the language in CACI Nos. 300, 303, and 350, which together defined the essential elements of the breach of contract claim. LAWPM reasons that, because these CACI instructions effectively told the jury that LAWPM's right to recover damages from Alameda was dependent upon LAWPM proving that Alameda had breached the contract, the jury was not equipped to consider the issue of damages separately from the issue of breach. The special verdict form, however, clearly

30

explained to the jury that the first two questions were to be answered separately and independently from each other. Indeed, question 2 on the verdict form did not make reference to any alleged breach of contract by Alameda, or even mention Alameda at all. Question 2 simply asked the jury to determine the cost, if any, of additional security services incurred by LAWPM as a result of the removal of the 8th-Central Gate, and to answer that question irrespective of its answer to question 1.

LAWPM also claims that the polling of the jury conducted after the verdict showed the confusing and misleading nature of the special verdict form. Contrary to LAWPM's contention, however, the polling merely showed that three of the 12 jurors believed that Alameda breached the contract and that LAWPM suffered damages, but did not reach a decision as to the amount of damages. Given that the other nine jurors found that LAWPM did not suffer damages, it is not surprising that the three dissenting jurors would find it unnecessary to settle on a specific dollar figure in response to question 2. On this record, LAWPM has failed to demonstrate reversible error in either the jury instructions or the special verdict form.

D. ***The Trial Court Did Not Err in Excluding LAWPM's Demonstrative Exhibit***

LAWPM further contends that the trial court committed prejudicial error when it refused to allow LAWPM to display a demonstrative exhibit regarding security costs. The exhibit in question was a one-page chart that purported to show a month-by-month breakdown of the $152,323.72 in additional security costs that LAWPM had incurred as a result of the removal of the 8th-Central Gate. LAWPM sought to display the chart during Gardner's testimony to help summarize how he calculated

31

the total amount of additional security costs incurred by LAWPM through the trial date. Defendants objected on the ground that the chart lacked an adequate foundation because LAWPM never produced any of the security invoices on which the rates and hours depicted in the chart were based. The trial court ruled that LAWPM's counsel could not display the chart, but could show the jury the total amount of costs, and then ask Gardner to explain how he calculated that figure.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 803; *Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 258.) Under this standard, a trial court's decision to admit or exclude evidence will not be disturbed " ' "unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Qaadir*, at p. 803.) Even where a trial court errs in ruling on the admissibility of evidence, reversal is required only "when the reviewing court, ' "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Alexander*, at p. 258.)

In general, "[t]rial courts have broad discretion to admit demonstrative evidence such as maps, charts, and diagrams to illustrate a witness's testimony." (*People v. Mills* (2010) 48 Cal.4th 158, 207.) " ' "[D]emonstrative evidence is admissible for the purpose of illustrating and clarifying a witness' testimony" so long as a proper foundation is laid.' " (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1037.) Here, the trial court reasonably could find that LAWPM failed to lay a proper foundation for its

chart because it did not produce any of the underlying records on which the mathematical calculations reflected in the chart were based.  The trial court also reasonably could find that a demonstrative exhibit that simply showed a month-by-month summary of the costs allegedly incurred by LAWPM would not aid the jury in understanding the substantive evidence before it.

Moreover, Gardner was permitted to testify as to the total amount of additional security costs that LAWPM was claiming to have incurred as result of the removal of the 8th-Central Gate.  He also was allowed to explain how he calculated that figure by multiplying the applicable hourly rate by the additional hours that were required to provide 24-hour security at the former location of the gate.  LAWPM has not shown how the exclusion of a demonstrative exhibit that itself was a summary of the simple mathematical calculations described by Gardner resulted in a miscarriage of justice.  Under these circumstances, the trial court did not abuse its discretion in refusing to allow LAWPM to display the demonstrative exhibit.

II.     **Defendants' Cross-Appeal from the Judgment in Favor of LAWPM on the First through Fourth Causes of Action**

In their cross-appeal, Defendants challenge the trial court's finding that LAWPM has standing to enforce the restrictions on the Truck Easement and Track Street West Easement set forth in the 1991 Easement Agreement.  The thrust of Defendants' argument is that LAWPM lacks standing because, under the 1982 Ground Lease, LAWPM does not have exclusive rights over the original Joint Use Area, and LAWPM cannot prove that the easements are located in an area that is outside of the Joint Use Area and thus subject to its exclusive control.  In rejecting

33

Defendants' argument, the trial court found that the evidence failed to establish where the Joint Use Area referenced in the 1982 Ground Lease is located, and whether the Track Street West Easement is inside or outside that area. The trial court also found that Defendants' attorney expert on title insurance and easement agreements was not qualified to plot the location of the Joint Use Area, or to otherwise opine as to where that area may be located.

In their cross-appeal, Defendants raise several arguments related to LAWPM's alleged lack of standing. In particular, Defendants contend that the trial court erroneously shifted the burden to Defendants to prove that LAWPM does not have standing to enforce the 1991 Easement Agreement, and that when the burden of proof is properly allocated, LAWPM cannot establish that it has standing. Defendants further assert that, regardless of which party had the burden of proof, there was substantial evidence to support a finding that the Track Street West Easement is in fact located in the Joint Use Area, and is therefore not subject to LAWPM's exclusive control. In addition, Defendants claim that, to the extent the evidence was insufficient to show where the Joint Use Area is located, the trial court erred when it decided to exclude the proffered testimony of Defendants' title expert regarding the location of that area. We conclude that none of these arguments has merit.

A.   ***LAWPM Satisfied Its Burden of Proving That It Has Standing to Enforce the 1991 Easement Agreement as the Lessee of Parcel 1***

Contrary to Defendants' contention on appeal, the trial court never shifted the burden to Defendants to prove that LAWPM lacked standing to enforce the provisions of the 1991

34

Easement Agreement. Rather, the record shows that the trial court repeatedly found that LAWPM has standing to enforce the 1991 Easement Agreement because it is the lessee of Parcel 1, the property burdened by the easements. The record further reflects that the trial court made its findings based on the plain language of the 1991 Grant Deed and the 1991 Easement Agreement, and after careful consideration of the parties' arguments regarding the proper interpretation of those agreements. We conclude that the trial court properly applied the law, and that its findings as to standing were supported by substantial evidence.

"Standing is a threshold issue necessary to maintain a cause of action, and the burden to allege and establish standing lies with the plaintiff." (*Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 809.) " '*To have standing, a party must be beneficially interested in the controversy*; that is, he or she must have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." [Citation.] The party must be able to demonstrate that he or she has some such beneficial interest that is concrete and actual, and not conjectural or hypothetical.' " (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 599.) "Standing is a question of law that we review independently. [Citation.] 'However, where the superior court makes underlying factual findings relevant to the question of standing, we defer to the superior court and review the findings for substantial evidence.' " (*United Farmers Agents Assn., Inc. v. Farmers Group, Inc.* (2019) 32 Cal.App.5th 478, 488.)

California law has long recognized that " '[u]nless specifically reserved to the landlord by the terms of the lease, everything that belongs to the demised premises or is used with,

35

or is appurtenant to, the premises, and reasonably necessary for their beneficial use and enjoyment, passes as an incident to a lease of the premises.' " (*Dubin v. Robert Newhall Chesebrough Trust* (2002) 96 Cal.App.4th 465, 473.) In other words, a lessee generally is provided with " ' "everything which belongs to the demised premises," ' " and rights such as easements "constitute an implied part of the lease." (*Owsley v. Hamner* (1951) 36 Cal.2d 710, 717.) In this case, it is undisputed that LAWPM is the current lessee of Parcel 1. At the November 2017 bench trial, the parties jointly stipulated that (1) SPTC leased Parcel 1 to LAWPMDC pursuant to the 1982 Ground Lease; (2) LAWPM is the assignee of, and successor-in-interest to, LAWPMDC's interest in the 1982 Ground Lease; and (3) the 1982 Ground Lease expires in 2048. It is also undisputed that both the Truck Easement and the Track Street West Easement cross Parcel 1.[11] The evidence before the trial court accordingly supported its finding that LAWPM, as current lessee of Parcel 1, has standing to enforce the restrictions on the easements that burden the leased premises.

In making this finding, the trial court expressly rejected Defendants' argument that LAWPM lacked standing because only NewLowe and Rykoff were parties to 1991 Easement Agreement. As the trial court aptly explained in its ruling on LAWPM's motion for a preliminary injunction: "In 1991, NewLowe owned Parcels A and 1. [Citation.] NewLowe then

---

[11] According to the testimony at the bench trial, 88 feet of the Track Street West Easement crosses Parcel 1, and the remaining 30 feet crosses Parcel A. Based on the survey maps admitted at the bench trial, a majority of the Truck Easement also crosses Parcel 1.

conveyed Parcel 1 to O Hill Properties, which leases the property to LAWPM. [Citation.] . . . In addition, the 1991 [Easement] Agreement provides that '[a]ll of the covenants, agreements, conditions and restrictions set forth in this Agreement are intended to be and shall be construed as covenants running with the land, binding upon, inuring to the benefit of and enforceable by the Parties hereto and all subsequent owners or lessees of, or any party having an interest in, their respective Parcels or any parts thereof. . . .' [Citation.] . . . [¶] Accordingly, LAWPM may therefore enforce the terms of the 1991 Agreement as a lessee of the property (Parcel 1) owned by O Hill Properties, as a successor in interest to NewLowe, which at the time of the 1991 Agreement was the owner of both Parcel A and Parcel 1."

In its December 15, 2017 statement of decision on the second and third causes of action, the trial court again found that LAWPM has standing to enforce the terms of the 1991 Easement Agreement, including the provision requiring the prior consent of the parties to reverse the flow of traffic on the Track Street West Easement. Based on the plain language of both the 1991 Grant Deed and the 1991 Easement Agreement, the trial court found that "it was the intent of the parties that NewLowe's rights under the agreements affected its rights as the owner of Parcels A and 1." The trial court further found that O Hill, as the successor to NewLowe's interest in Parcel 1, has standing to "enforce the agreements creating and controlling the easements that are over Parcel 1," and that "this standing extends to [O Hill's] long-term tenant LAWPM during the period of the tenancy."

The trial court's rulings make clear that the court did not misallocate the burden of proof to Defendants. Rather, the court

37

made its findings as to standing after an exhaustive review of the relevant agreements in which the court interpreted the plain language of those agreements to give effect to the contracting parties' mutual intent. (See *Cortez v. Doty Bros. Equipment Co.* (2017) 15 Cal.App.5th 1, 16 ["[t]he fundamental rule of contract interpretation is to give effect to the mutual intent of the parties at the time they formed the contract"]; Civ. Code, § 1636 ["[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting"].) In seeking to challenge the trial court's findings on appeal, Defendants contend that LAWPM's burden to prove standing in this case required LAWPM to specifically refute Defendants' argument against standing by proving a negative, namely that the Track Street West Easement is *not* located in the Joint Use Area. Defendants claim that, unless LAWPM can show that the Track Street West Easement falls outside of the Joint Use Area, LAWPM cannot establish that it has standing to enforce any restrictions on that easement. We disagree, however, that LAWPM's burden to prove its standing to enforce the terms of the 1991 Easement Agreement required LAWPM to also disprove Defendants' theory as to why standing is lacking.

Instead, LAWPM met its burden of proving that it has standing to enforce the 1991 Easement Agreement by showing that it leases all of Parcel 1, and that the Truck Easement and Track Street West Easement cross Parcel 1. While Defendants argue that the Joint Use Area was "carved out of the exclusive rights granted to LAWPM" under the 1982 Ground Lease, they do not dispute that the Joint Use Area was still part of the leased, or demised, premises. Indeed, the amendment to the 1982 Ground Lease specifically defines the Joint Use Area as

38

"that part of [SPTC's] Portion of the Eighth Street Access Area that becomes *part of the Demised Premises*, together with the *portion of the Demised Premises* shown tinted mauve on Exhibit 'B' attached hereto." Therefore, to the extent that LAWPM's use of the Joint Use Area was non-exclusive under the 1982 Ground Lease, this does not show that LAWPM lacks standing to enforce its rights as the lessee of the premises burdened by the easements.[12] On this record, the trial court did not err in finding that LAWPM has standing to enforce the terms of the 1991 Easement Agreement.

B. ***The Trial Court Did Not Err in Failing to Find that the Track Street Easement Is Located in the Joint Use Area***

Defendants further argue that, even if the burden of proof on standing was properly allocated, the trial court erred when it refused to find that the Track Street West Easement is in fact located in the original Joint Use Area, and is thus not subject to LAWPM's exclusive control. In its December 15, 2017 Statement

---

[12] The cases on which Defendants rely to support their claim that LAWPM lacks standing are inapposite. (*Los Angeles & R.R. Co. v. New Liverpool Salt Co.* (1906) 150 Cal. 21; *Nahas v. Retail Clerks International Assn.* (1956) 144 Cal.App.2d 808.) In each of those cases, the court concluded that the lessee could not enforce rights over certain property that was never a part of the leased premises. (*Los Angeles & R.R. Co.*, at p. 25 [lessee did not have possessory rights over railroad tracks that "formed no part of the leased premises"]; *Nahas*, at p. 820 [lessee did not have possessory rights over parking lot and sidewalks that were excluded from leased premises].) Here, LAWPM leases the entirety of Parcel 1, and the Joint Use Area was a part of the leased premises.

of Decision, the trial court noted that Defendants had "take[n] the position that the Track Street West Easement runs over the Joint Use Area, and that this area was specifically carved out from the lease of Parcel 1 to LAWPM."  The court explained that if the lessor had "carved out a portion of Parcel 1 from its lease to LAWPM to allow vehicles from Parcels A, B and C to travel over the Joint Use Area, that would affect LAWPM's ability to assert rights of NewLowe under the 1991 Easement Agreement."  The court ultimately concluded, however, that it could not determine from the evidence whether the Track Street West Easement is located in the Joint Use Area, and as a result, Defendants could not support their argument that LAWPM has no right to control the flow of traffic on that easement.  In their cross-appeal, Defendants assert that the trial court erred because there was substantial evidence to support a finding the Track Street West Easement is inside the Joint Use Area.  This argument is unavailing.

Despite the voluminous record in this case, none of the surveys, maps, or other documents presented to the trial court showed the location of the Joint Use Area on Parcel 1.  As the trial court correctly noted, both the 1982 Ground Lease and the 1983 Amendment to that lease described the Joint Use Area as being depicted in mauve tint on "Exhibit B"; however, "Exhibit B" was not attached to either document.  Likewise, neither the 1991 Grant Deed nor the 1991 Easement Agreement included any reference to the location of the Joint Use Area.  Although the 1993 Settlement Agreement stated that the parties had agreed to modify their rights with respect to the "Original Joint Use Area," that agreement also did not include a map or survey showing where the "Original Joint Use Area" was located.

The 1993 Settlement Agreement did include a legal description of the metes and bounds of "Original Joint Use Area." Defendants argue that the trial court itself could have used this legal description to plot the location of the Joint Use Area on one of the surveys LAWPM's licensed surveyor had prepared to show the location of the easements. As the trial court observed, however, "nowhere does this legal description mention the Track Street West Easement, nor can this court as a lay reader of this provision determine where the Track Street West Easement is found with respect to the Joint Use Area, i.e., in the area or not in the area." While Defendants contend that a survey expert was not required to plot the location of the Joint Use Area, "technical legal descriptions of real property have precise meanings to trained professionals" that are often beyond the common understanding of a layperson. (*Lee v. Fidelity National Title Ins. Co.* (2010) 188 Cal.App.4th 583, 598.) In this case, none of the surveys prepared by the parties' experts purported to show the Joint Use Area. Additionally, neither LAWPM's surveyor nor Defendants' surveyor offered any testimony as to where the Joint Use Area was located, or whether the Track Street West Easement was inside the Joint Use Area. Given the state of the evidence, the trial court did not err in declining to find that the Track Street West Easement is located in the Joint Use Area.

C. ***The Trial Court Did Not Err in Excluding the Proffered Opinion of Defendants' Title Expert on the Location of the Joint Use Area***

Lastly, Defendants contend that the trial court committed prejudicial error when it excluded the proffered testimony of their title expert, Kenneth Dzien, regarding the location of the Joint Use Area. Defendants called Dzien, an attorney and consultant

41

to title insurance companies, to testify as a rebuttal expert on the proper interpretation of the easement agreements and title documents. Defendants also sought to elicit testimony from Dzien that he had determined the location of the Joint Use Area referenced in the 1982 Ground Lease based on his review of the legal description of the "Original Joint Use Area" set forth in the 1993 Settlement Agreement and a survey prepared by Defendants' surveyor. The trial court sustained LAWPM's objection to such testimony on the ground that Defendants had failed to lay an adequate foundation to show that Dzien was qualified as a survey expert. We find no abuse of discretion in the trial court's ruling.

Under Evidence Code section 801, "a trial court acts as a 'gatekeeper to exclude speculative or irrelevant expert opinion.' [Citation.] A trial court may exclude expert testimony if the type of matter on which the expert relies is unreasonable and also if the matter relied upon does not ' "provide a reasonable basis for the particular opinion offered." ' " (*Waller v. FCA US LLC* (2020) 48 Cal.App.5th 888, 894.) A trial court also has " 'the obligation to contain expert testimony within the area of the professed expertise, and to require adequate foundation for the opinion.' " (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 292.) Accordingly, " '[t]rial judges have a substantial gatekeeping responsibility when it comes to expert testimony. [Citation.] . . . We review a court's execution of these gatekeeping duties for an abuse of discretion." (*Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 576.)

Here, the trial court acted well within its discretion in excluding Dzien's proffered testimony on a matter for which he lacked the requisite expertise. As the trial court noted, Dzien

42

is not a surveyor. He testified that he had prior experience examining abstracts of title, and that, "on a good day [he] can trace out the legal description" of real property contained in a title document. Dzien did not, however, prepare any of the surveys in this case, and did not claim to have any personal knowledge as to how those surveys were prepared.

Additionally, when asked how he determined the location of the Joint Use Area, Dzien testified that he used the legal description contained in the 1993 Settlement Agreement to map out the Joint Use Area on the survey that was prepared by Defendants' surveyor. As discussed, however, none of the various surveys prepared by the parties' experts purported to show the location of the Joint Use Area, and the surveyors themselves never testified as to where the Joint Use Area was located. On this record, the trial court reasonably could conclude that Dzien's proffered opinion about the location of the Joint Use Area lacked an adequate foundation, and was therefore inadmissible.

III. **LAWPM's Appeal from the Award of Attorneys' Fees to Alameda**

LAWPM also appeals from the postjudgment order granting Alameda $804,461.20 in attorneys' fees as the prevailing party on the fifth cause of action. LAWPM argues the fee award in favor of Alameda should be reversed because (1) the trial court erroneously determined that Alameda was entitled to attorneys' fees as the prevailing party under Code of Civil Procedure section 1032 (section 1032) instead of conducting its analysis under Civil Code section 1717 (section 1717); (2) the trial court abused its discretion in determining that Alameda's fee request was reasonable and supported by sufficient evidence; and (3) the trial court abused its discretion in awarding fees to

43

Alameda that were not connected to the fifth cause of action. We conclude the trial court did not abuse its discretion in awarding attorneys' fees to Alameda, but the award must be reduced to exclude the hours expended on certain matters that were unrelated to the fifth cause of action.

A. **Relevant Facts**

Prior to entering a judgment on LAWPM's first amended complaint, the trial court asked the parties to submit briefing on the issue of which party was the prevailing party for purposes of the judgment. While LAWPM argued that it was the prevailing party in the action because it had achieved its main litigation objective, Defendants asserted that Alameda had prevailed on the fifth cause of action for breach of the 1993 Settlement Agreement. The trial court found that, under section 1032, LAWPM was the prevailing party on the first through fourth causes of action, and Alameda was the prevailing party on the fifth cause of action.

LAWPM filed a motion for attorneys' fees pursuant to section 1717. LAWPM contended it was entitled to attorneys' fees incurred in connection with the first through fourth causes of action under the 1991 Easement Agreement and the 1993 Settlement Agreement. Both agreements included provisions for attorneys' fees.[13] The trial court granted LAWPM's motion, and

[13] The 1991 Easement Agreement provided that "[i]f either Party brings any suit or initiates any other proceeding to enforce this Agreement, the prevailing Party in such suit or other proceeding . . . shall, in addition to such other relief as may be awarded, be entitled to recover all costs reasonably incurred by it in connection with such proceeding (including, without limitation, attorneys' fees and expenses). The 1993 Settlement Agreement stated that "[i]n the event of litigation or arbitration relating to

44

awarded LAWPM a total of $1,061,060.25 in attorneys' fees as the prevailing party on the first through fourth causes of action.

Alameda also filed a motion for attorneys' fees pursuant to section 1717. Alameda argued it was entitled to attorneys' fees incurred in connection with the fifth cause of action because it was the prevailing party under the 1993 Settlement Agreement. Alameda sought to recover $1,504,590.20 in attorneys' fees incurred from July 2016 through July 2019.

LAWPM opposed Alameda's motion on several grounds. Among other arguments, LAWPM asserted that, for purposes of determining the prevailing party under section 1717, the 1991 Easement Agreement and the 1993 Settlement Agreement should be considered together. LAWPM also argued that, even if the agreements were analyzed separately, Alameda still could not establish it was the prevailing party on the 1993 Settlement Agreement. LAWPM further contended that the attorneys' fees sought by Alameda were unreasonable and overreaching, and were not supported by sufficient evidence. LAWPM's opposition included an attorney declaration attaching various charts, which identified the billing entries that LAWPM claimed were vague, excessive, or not related to the breach of contract claim.

At the hearing on Alameda's motion for attorneys' fees, the trial court identified a number of deficiencies in Alameda's moving papers. Rather than deny the motion outright, the court ordered Alameda to provide updated billing statements and summary totals that excluded any time billed prior to April 14, 2017, the filing date of the first amended complaint when the

_____

this Agreement, the prevailing party in such litigation shall be entitled to recover its attorneys' fees and costs."

45

fifth cause of action for breach of contract was first alleged.  The court also ordered Alameda to provide accurate comparable billing rates of similarly situated attorneys.  Although Alameda thereafter filed a supplemental brief and declarations that included additional information, it continued to request the same amount in attorneys' fees.

On January 24, 2020, following a further hearing on Alameda's motion, the trial court awarded Alameda $804,461.20 in attorneys' fees as the prevailing party on the fifth cause of action.  The court found that, because Alameda's recovery was limited to the fifth cause of action, Alameda was not entitled to fees for work performed prior to April 14, 2017.  The court also found that Alameda was only entitled to recover one-fifth of the fees sought for work performed from April 14, 2017 to August 16, 2017, the date of the ruling on LAWPM's summary judgment motion.  In addition, the court found that Alameda was not entitled to fees for work performed from August 16, 2017 through December 22, 2017, because such work solely related to the court trial on the equitable claims.  The court allowed Alameda to recover fees for work performed from January 2018 onward, but stated that it was excluding work performed in connection with Alameda's new trial motion, appeal, and oppositions to LAWPM's fees and costs motions.  The court found that, subject to these deductions, the hourly rate and number of hours expended were reasonable, and that Alameda was not required to further explain the work performed by each individual attorney.

B. ***The Trial Court Did Not Abuse its Discretion in Determining that Alameda was the Prevailing Party on the Fifth Cause of Action***

In challenging the attorneys' fee award to Alameda, LAWPM contends that the trial court abused its discretion in finding that Alameda was the prevailing party on the fifth cause of action under section 1032.  LAWPM asserts that the trial court instead should have analyzed whether Alameda was the prevailing party under section 1717 by considering the 1991 Easement Agreement and the 1993 Settlement Agreement together, and should have found that LAWPM was the sole prevailing party on those contracts because it achieved lopsided results in the litigation.  LAWPM further argues that, even if the agreements are considered separately, Alameda still cannot be deemed the prevailing party on the 1993 Settlement Agreement because that contract was also at issue in the equitable claims on which LAWPM clearly prevailed.  Based on the totality of the record, however, we conclude the trial court did not abuse its discretion in determining that Alameda was entitled to attorneys' fees as the prevailing party on the breach of contract claim.

"Generally, a trial court's determination that a litigant is a prevailing party, along with its award of fees and costs, is reviewed for abuse of discretion." (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)  " ' "However, de novo review . . . is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." ' " (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.)

47

Under section 1032, "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).)  For purposes of a cost award, a "prevailing party" is defined as (1) "the party with a net monetary recovery," (2) "a defendant in whose favor a dismissal is entered," (3) "a defendant where neither plaintiff nor defendant obtains any relief," and (4) "a defendant as against those plaintiffs who do not recover any relief against that defendant." (*Id*., subd. (a)(4).)  However, "[i]f any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed, may apportion costs between the parties on the same or adverse sides . . . ." (*Id*., subd. (a)(4).)  Accordingly, " 'section 1032 . . . declares that costs are available as "a matter of right" when the prevailing party is within one of the four categories designated by statute. . . .  In other situations or when a party recovers other than *monetary* relief, the prevailing party is determined by the court, and the award of costs is within the court's discretion.' " (*David S. Karton*, *A Law Corp. v. Dougherty* (2014) 231 Cal.App.4th 600, 611.)

Attorneys' fees are allowable as costs when authorized by contract, statute, or law.  (Code Civ. Proc., § 1033.5, subd. (a)(10).)  Section 1717 governs attorneys' fees based on a contract, and authorizes an award of attorneys' fees "[i]n any action on a contract" to "the party prevailing on the contract" where the contract specifically provides for an award of attorneys' fees. (Civ. Code, § 1717, subd. (a).)  Subject to certain exceptions not applicable in this case, "the party prevailing on the contract

48

shall be the party who recovered a greater relief in the action on the contract." (*Id*., subd. (b)(1).) Generally, "[w]hen determining the prevailing party under section 1717, the trial court 'is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.' " (*Silver Creek, LLC v. BlackRock Realty Advisors, Inc.* (2009) 173 Cal.App.4th 1533, 1539.) "A trial court has wide discretion in determining which party is the prevailing party under section 1717, and we will not disturb the trial court's determination absent 'a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence.' " (*Ibid*.)

LAWPM argues that the trial court misapplied the law when it determined that Alameda could recover attorneys' fees as the prevailing party on the fifth cause of action because the court made its determination under section 1032, which governs costs awards, rather than section 1717, which governs attorneys' fees awards on a contract. It is true, as LAWPM asserts, that "the prevailing party for purposes of a contractual attorney fees award under Civil Code section 1717 . . . is not necessarily the prevailing party for purposes of a costs award under Code of Civil Procedure section 1032." (*David S. Karton, A Law Corp. v. Dougherty*, *supra*, 231 Cal.App.4th at p. 607.) Thus, "[t]he determination of the party prevailing on the contract for purposes of awarding attorney fees under section 1717 must be made independently of the determination of the party prevailing in the overall action for purposes of awarding costs under . . . section 1032." (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 239, italics omitted.) In this case,

49

however, the record does not demonstrate that the trial court failed to determine whether Alameda was the prevailing party under section 1717 in ruling on its motion for attorneys' fees.

Alameda specifically brought its motion for attorneys' fees under section 1717, and argued that it was entitled to an award of attorneys' fees because it was the prevailing party on the 1993 Settlement Agreement, the contract at issue in the fifth cause of action. In opposing Alameda's motion, LAWPM contended that the 1991 Easement Agreement and the 1993 Settlement Agreement must be considered together for purposes of determining the prevailing party under section 1717, and that LAWPM was the prevailing party under the statute because it had achieved lopsided results on those two related agreements. LAWPM also expressly asserted that Alameda's motion for attorneys' fees "must be analyzed independently of the Court's prior finding that Alameda is the prevailing party on the fifth cause of action."

In its written ruling on Alameda's motion, the trial court correctly stated the law that attorneys' fees may be awarded as costs under section 1032 when they are provided for by contract, and that section 1717 authorizes an award of attorneys' fees in an action on a contract to the prevailing party on the contract. The court also summarized the arguments set forth in LAWPM's opposition as to why Alameda should not be deemed the prevailing party for purposes of a contractual attorneys' fees award. The court then concluded that Alameda was entitled to recover attorneys' fees as the prevailing party on the fifth cause of action only. Although the court referenced its prior determination as to the prevailing parties under section 1032, it did not state that it was deciding Alameda's right to attorneys'

fees based solely on this prior determination and without considering the parties' arguments under section 1717. Rather, when considered as a whole, the court's ruling reflects that it awarded Alameda attorneys' fees on the fifth cause of action for breach of the 1993 Settlement Agreement because it determined that Alameda was the prevailing party on that contract under section 1717. On this record, LAWPM has failed to affirmatively demonstrate that the court misconstrued or misapplied the law in making its prevailing party determination. (*Wertheim, LLC v. Omidvar* (2016) 3 Cal.App.5th 921, 925 ["On appeal a trial court's order 'is presumed correct. Error must be affirmatively shown.' "].)

LAWPM also asserts that the trial court erred in failing to analyze the 1991 Easement Agreement and the 1993 Settlement Agreement together to determine whether Alameda was the sole prevailing party on those contracts for purposes of section 1717. Under section 1717, "there may only be one prevailing party entitled to attorney fees on a given contract in a given lawsuit." (*Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, 520.) On the other hand, "[w]here multiple independent contracts are involved in one lawsuit, and each contract provides an independent entitlement to fees, it is necessary to determine the prevailing party under each contract." (*Id.* at p. 543; see *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 491 ["[w]hen an action involves multiple, independent contracts, each of which provides for attorney fees, the prevailing party . . . must be determined as to each contract regardless of who prevails in the overall action"]; *Hunt v. Fahnestock* (1990) 220 Cal.App.3d 628, 630 ["in a lawsuit involving several contracts, attorney's fees

51

pursuant to . . . section 1717 may be awarded to the prevailing party on each contract whether or not that party is a prevailing party in the lawsuit"].)

LAWPM contends that the 1991 Easement Agreement and the 1993 Settlement Agreement were interrelated because they both governed the parties' respective easement rights and were the subject matter of the first phase of the trial in this case. The trial court reasonably could have concluded, however, that the two agreements were separate and independent contracts for purposes of determining the prevailing party under section 1717. The 1991 Easement Agreement concerned the parties' rights with respect to the three easements – the Eighth Street Easement, the Truck Easement, and the Track Street West Easement – that were conveyed pursuant to the 1991 Grant Deed. The 1993 Settlement Agreement, on the other hand, governed the parties' rights and obligations with respect to the 8th-Central Gate. Although the trial court briefly discussed the 1993 Settlement Agreement in its December 15, 2017 Statement of Decision on the second and third causes of action, it did so solely in the context of addressing Defendants' argument about the location of the Joint Use Area.[14] The court did not otherwise consider the 1993

_____

[14] As previously discussed, Defendants argued that the location of the Joint Use Area, as referenced in the 1982 Ground Lease, could be determined based upon the legal description of the "Original Joint Use Area" included in one of the exhibits to the 1993 Settlement Agreement. The trial court rejected Defendants' argument because that exhibit did not make any reference to the easements at issue in the case, and a layperson could not plot the location of the Joint Use Area on a survey map based solely on a metes and bounds description.

Settlement Agreement in determining the parties' respective rights under the 1991 Easement Agreement. Indeed, the 1993 Settlement Agreement did not mention any of the easements that were the subject of LAWPM's first through fourth causes action. Under these circumstances, the trial court did not err in failing to determine that there was a single prevailing party on the two contracts under section 1717.[15]

LAWPM further argues that, even if the 1991 Easement Agreement and the 1993 Settlement Agreement are considered separately for purposes of section 1717, Alameda still could not

_____

[15] In a related argument, LAWPM asserts that, because there can be only one prevailing party for purposes of costs awarded pursuant to section 1032, the trial court also erred in determining that Alameda was a co-prevailing party under that statute and awarding Alameda $22,886.86 in costs. As a general rule, there is a single prevailing party under the mandatory costs award provision of section 1032, subdivision (a)(4). (*Sharif v. Mehusa, Inc.* (2015) 241 Cal.App.4th 185, 194.) However, where the prevailing party does not fall within one of the four mandatory costs categories specified in section 1032, subdivision (a)(4), the statute "permits the trial court to determine the prevailing party and then allow costs or not, or to apportion costs, in its discretion." (*Texas Commerce Bank v. Garamendi* (1994) 28 Cal.App.4th 1234, 1248-1249.) In such a situation, more than one party may qualify as a prevailing party for purposes of a costs award, and the trial court has discretion to decide how to apportion costs between them. (*Wohlgemuth v. Caterpillar Inc.* (2012) 207 Cal.App.4th 1252, 1264; *On-Line Power, Inc. v. Mazur* (2007) 149 Cal.App.4th 1079, 1087.) Here, the record reflects, that the trial court exercised the discretion afforded by section 1032, subdivision (a)(4) in determining that Alameda had prevailed on the fifth cause of action. We see no abuse of discretion in that ruling.

53

be deemed the prevailing party under the 1993 Settlement Agreement. This argument lacks merit. While LAWPM achieved an unqualified victory on the first through fourth causes of action under the 1991 Easement Agreement, Alameda achieved an unqualified victory on the fifth cause of action under the 1993 Settlement Agreement. The fact that LAWPM may have obtained a greater recovery in the overall action by prevailing on the four equitable claims did not preclude the trial court from determining that Alameda was the prevailing party on the breach of contract claim. (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, *supra*, 47 Cal. App.4th at p. 491 ["[t]he fact that a party 'obtained a higher net recovery in the lawsuit is irrelevant to the determination of which party prevailed on any particular action on a contract' "].) "A trial court's determination as to which party has prevailed ' "will not be disturbed on appeal absent a clear abuse of discretion." ' " (*City of West Hollywood v. Kihagi* (2017) 16 Cal.App.5th 739, 753.) LAWPM has failed to make such a showing here.

C. ***The Trial Court Did Not Abuse Its Discretion in Determining the Reasonableness of Alameda's Request for Attorneys' Fees***

LAWPM claims the trial court failed to conduct a lodestar analysis prior to awarding attorneys' fees to Alameda. LAWPM specifically contends that the evidence was insufficient to establish that the rates and hours requested by Alameda were reasonable, thus, the trial court erred when it calculated the resulting fee award. We conclude that the trial court did not abuse its discretion in determining the reasonableness of Alameda's fee request.

54

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group*, *Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) "The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided." (*Ibid*.) Those factors include "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.) " 'Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary.' " (*Id*. at p. 1134.)

" 'The amount of an attorney fee to be awarded is a matter within the sound discretion of the trial court. [Citation.] The trial court is the best judge of the value of professional services rendered in its court, and while its judgment is subject to our review, we will not disturb that determination unless we are convinced that it is clearly wrong. [Citation.] The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination.' " (*Blue Mountain Enterprises*, *LLC v. Owen* (2022) 74 Cal.App.5th 537, 559; see *Concepcion v. Amscan Holdings*, *Inc.* (2014) 223 Cal.App.4th 1309, 1319 [with respect to the amount of fees awarded, " 'there is no question our review must be highly deferential to the views of the trial court' "].)

LAWPM asserts the trial court failed to conduct a lodestar analysis to determine whether the rates and hours claimed by Alameda were reasonable. In granting Alameda's motion, however, the trial court made the specific finding that "Defendants have sufficiently provided their lodestar figures of 'reasonable rates' and 'reasonable number of hours.'" The court also expressly stated that "an analysis of reasonableness has taken place in this case and the resulting fee award reflects the reasonable number of hours expended by counsel." The resulting fee award did not compensate Alameda for all of the hours requested, but rather excluded hours that the trial court determined were not reasonably expended on the fifth cause of action.

In finding that Alameda had "sufficiently supported its requested billing rates," the court explained that Alameda's fee expert had submitted a supplemental declaration in which he described the rates of Alameda's attorneys as being within the range of "rates of attorneys at comparable firms in comparable real estate litigation matters." Based on such evidence, the court found "the requested billing rates to be reasonable." On appeal, LAWPM disputes whether the firms and types of matters identified by Alameda's expert were sufficiently comparable to the firms used and work performed in this case to support the hourly rates sought. In determining a reasonable hourly rate, however, " 'the court may rely on its own knowledge and familiarity with the legal market, as well as the experience, skill, and reputation of the attorney requesting fees [citation], the difficulty or complexity of the litigation to which that skill was applied [citations], and affidavits from other attorneys regarding prevailing fees in the community and rate determinations in

56

other cases.' " (*Morris v. Hyundai Motor America* (2019) 41 Cal.App.5th 24, 41.) Indeed, " 'the trial court is in the best position to value the services rendered by the attorneys in his or her courtroom [citation], and this includes the determination of the hourly rate that will be used in the lodestar calculus.' " (*Nishiki v. Danko Meredith, P.C.* (2018) 25 Cal.App.5th 883, 898.)

LAWPM also argues that the declarations submitted by Alameda in support of its fee request failed to describe with sufficient particularity the relevant background, experience, and type of work performed by each biller in this case. The record reflects, however, that Alameda supported its motion with billing invoices for each of the three firms that represented it over the course of the litigation. Those invoices generally identified the name of each biller, the date of each billing entry, a description of the task performed, the time spent on that task, and the biller's hourly rate. Alameda also provided summary charts identifying each biller by name, position, date of bar admission, and hourly rate, and showing the total hours and actual amounts that he or she billed each month to the case. "It is well established that 'California courts do not require detailed time records, and trial courts have discretion to award fees based on declarations of counsel describing the work they have done and the court's own view of the number of hours reasonably spent.' " (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 698.) In this case, the trial court concluded that it had enough information to evaluate the rates and hours sought by Alameda. The trial court did not abuse its discretion in determining that, subject to certain deductions made by the court, the requested rates and hours were reasonable.

D. ***The Amount of Attorneys' Fees Awarded to Alameda Must Be Reduced to Accurately Reflect the Trial Court's Ruling***

Finally, LAWPM argues the trial court abused its discretion when it awarded attorneys' fees to Alameda for hours that were not reasonably expended in connection with the fifth cause of action. In particular, LAWPM contends the fee award should have excluded hours that were billed in connection with the first through fourth causes of action between January 2018 and July 2019. LAWPM also claims that the fee award should have excluded hours that were duplicative, excessive, or based on vague billing entries. Consistent with the trial court's ruling, we conclude that the amount of attorneys' fees awarded to Alameda must be reduced to exclude the hours expended on certain unrelated matters, including Alameda's motion for new trial, appeal, oppositions to LAWPM's fees and costs motions, unfiled cross-complaint, and new lawsuit.

In its ruling on Alameda's motion for attorneys' fees, the trial court stated that it agreed with LAWPM that Alameda's "fees for January 2018 onwards should not include entries related to the new trial, appeal, or opposing LAWPM's fees and costs motions." The court also indicated, however, that its calculations of the fee award "already remove these entries, which were highlighted in yellow in the defendants' submission." As LAWPM correctly points out, the "highlighted" entries in Alameda's billing records do not relate to the hours billed on these specific matters, and thus, the trial court's calculations failed to properly exclude such hours from the resulting fee award. In its opposition to Alameda's motion, LAWPM attached as exhibit E to the declaration of Steven Kuehl a chart showing the billing

58

entries that LAWPM contends were not related to the fifth cause of action. We have reviewed exhibit E for entries specifically related to Alameda's motion for new trial, appeal, and oppositions to LAWPM's fees and costs motions. Those entries represent a total of $33,604.60 in attorneys' fees.[16] Alameda's fee award accordingly must be reduced by this amount.

In its opposition to Alameda's motion, LAWPM also argued that the trial court should exclude hours that were billed between January 2018 and July 2019 in connection with a cross-complaint that Alameda never filed and a new lawsuit that Alameda filed against LAWPM in February 2019. In support of this argument, LAWPM attached as exhibit G to the declaration of Steven Kuehl a chart showing the billing entries that LAWPM asserts were related to this cross-complaint and separate lawsuit. Although

---

[16] As reflected in exhibit E to Steven Kuehl's declaration, there were a total of 18 billing entries which LAWPM specifically identified as pertaining to Alameda's new trial motion, appeal, or oppositions to LAWPM's fees and costs motions. Those entries consisted of the following amounts in requested attorneys' fees: (1) $3,173.40 on June 5, 2019; (2) $1,366.20 on June 10, 2019; (3) $1,552.50 on June 12, 2019; (4) $1,992.60 on June 14, 2019; (5) $4,222.80 on June 17, 2019; (6) $590.40 on July 1, 2019; (7) $4,533.30 on July 2, 2019; (8) $3,477.60 on July 3, 2019; (9) $205.50 on July 8, 2019; (10) $186.30 on July 10, 2019; (11) $496.80 on July 11, 2019; (12) $2,877.00 on July 11, 2019; (13) 3,082.50 on July 12, 2019; (14) $621.00 on July 16, 2019; (15) $1,438.50 on July 16, 2019; (16) $685.00 on July 24, 2019; (17) $2,730.60 on July 25, 2019; and (18) $372.60 on July 26, 2019. Although the trial court agreed that these categories of entries should not be included in the attorneys' fee award, it erroneously believed that Alameda had already excluded them from its total fee request.

59

the trial court did not specifically address these entries in its ruling on Alameda's motion, the court did state that it "agrees with LAWPM that Alameda's recovery is limited to the Fifth Cause of Action."  Alameda did not explain how these entries were connected to the fifth cause of action in the proceedings before the trial court, nor does it address the issue on appeal.  We have reviewed exhibit G, and agree with LAWPM that the entries reflected in this chart are not related to the fifth cause of action.  Those entries represent a total of $74,694.30 in attorneys' fees.  Alameda's fee award therefore must also be reduced by this amount.

LAWPM's remaining objections to the fee award primarily relate to billing entries that it asserts were duplicative, excessive, or vague.  The trial court rejected these arguments, however, in its ruling on Alameda's attorneys' fees motion and found that, with one exception, Alameda's "billing entry descriptions and tasks are acceptable."  The court also found that Alameda was not required "to further explain the work performed by each individual attorney in order to recover" fees for these entries.  We have reviewed the challenged entries, and conclude the trial court reasonably could find that these entries were not duplicative, excessive, or impermissibly vague.  On this record, trial court did not abuse its discretion in refusing to exclude these entries from its calculation of the fee award.

## DISPOSITION

The judgment is affirmed.  The postjudgment order awarding attorneys' fees to Alameda is modified by striking a total of $108,298.90 from the amount awarded, and is affirmed as modified.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


ADAMS, J.[*]


We concur:


EDMON, P.J.


LAVIN, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.